UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GUADALUPE GONZALEZ<br><br>        Plaintiff,<br><br>        v.<br><br>MERCED COUNTY, MERCED COUNTY SHERIFF'S DEPARTMENT, JOHN MCKNIGHT, individually and in his capacity as a Merced County Sheriff's Deputy; JASON COPE, individually and in his capacity as a Merced County Sheriff's Deputy; and DOES 1 through 50, inclusive,<br><br>        Defendants. | 1:07-CV-01146-OWW-SMS<br><br>MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL ADJUDICATION (DOC. 52) |

## I. INTRODUCTION.

This case arises out of an encounter on February 15, 2007 between Plaintiff Guadalupe Gonzalez and Merced County Sheriff Deputies at Castle Airport in Atwater, California. Plaintiff alleges that two Merced County Sheriff Deputies unlawfully arrested and tasered him following a dispute over how to intercede on behalf of an airplane with malfunctioning landing gear.

Plaintiff's complaint asserts five claims based upon the allegations of excessive force and wrongful arrest: (1) violation of Title 42, United States Code, Section 1983 against all

1

defendants; (2) violation of Article I, § 13 of the California Constitution against all defendants; (3) assault and battery against all defendants; (4) false arrest and imprisonment against all defendants; and (5) negligence against all defendants.

Before the court for decision is a motion for summary judgment, or in the alternative, summary adjudication filed by Defendants County of Merced, Merced County Sheriff's Department, and Merced County Sheriff's Deputies John McKnight and Jason Cope. (Doc. 52.)

## II. FACTUAL BACKGROUND.

### A.   The Parties

Plaintiff is an individual and resident of the City of Atwater.  (Compl. ¶ 5.)  At all relevant times herein, Plaintiff was working as director of maintenance for the American School of Aviation ("ASA"), a flight school operating out of Castle Airport in Atwater.  (Id. ¶ 11.)

Defendant County of Merced is a municipal entity organized under California law.  (Compl. ¶ 6.)  Merced County Sheriff's Department is a political subdivision of the County of Merced, with the responsibility to maintain and administer law enforcement in Merced County.[1]  (Id.)  Defendant John McKnight is a deputy with

---

[1]  "Merced County Sheriff's Department" is not a legal entity. *Maxwell v. Henry*, 815 F. Supp. 213, 215 (S.D. Tex. 1993).  Nor is the Merced County Sheriff's Department a "person" for purposes of § 1983 litigation. *Vance v. County of Santa Clara*, 928 F. Supp. 993 (N.D. Cal. 1996).  Plaintiff has also sued "Merced County" which is the proper legal entity to be sued in this type of case. Therefore, as a matter of law, the claims against Defendant Merced County Sheriff's Department must be

the Merced County Sheriff's Department, primarily working out of the Castle airport managing Merced County's aircraft. (*Id.*; Defendant's Statement of Undisputed Material Facts ("DSUMF") # 106.) Jason Cope is a deputy with the Merced County Sheriff's Department. (Compl. ¶ 6.)

## B. Events Leading up to The February 2007 Incident

## 1. Undisputed Facts.[2]

At approximately 2:45 p.m. on February 15, 2007, an ASA-owned plane reported that its right landing gear wheel would not release, leaving only the left and nose wheels in landing position. (Compl. 11.) An ASA flight instructor and his student were controlling the plane when the malfunction occurred. (Dep. of J. McKnight pg. 63.) ASA employees, including Plaintiff, discussed various options to release the airplane's right wheel. (Compl. ¶ 11) One potential solution was to drive a Hummer owned by Manpreet Singh ("Singh"), the owner of ASA flight school, underneath the airborne plane and have Plaintiff reach through the sunroof with a metal hook and manually release the plane's landing gear. (DSUMF # 1.) Plaintiff had never seen or personally performed this maneuver prior to February 15, 2007. (DSUMF # 7.)

Around this time, Scott Malta, the manager of Castle Airport, heard a radio transmission concerning the plane's malfunctioning

_____

dismissed.

[2] Plaintiff filed objections to certain items of Defendants' evidence. Except where otherwise noted, such evidence is immaterial to the court's analysis of Defendants' motion or the objections are without merit.

landing gear. (DSUMF # 79; Dec. of S. Malta pg 25.) He called the tower to inquire. (*Id*.) Shortly thereafter he was contacted by Singh, owner of ASA, and Singh told Malta that they intended to drive his Hummer under the plane and have the passenger step into the sunroof and manually release the landing gear with a metal hook. (DSUMF # 79; Dec. of S. Malta pg. 67) Malta, who had ultimate authority over the airfield, told them not to proceed and he would be there shortly. (*Id*.; DSUMF ## 6, 124.) ASA employees knew Scott Malta was in charge of the airport. (*Id*.)

Malta then contacted Deputy McKnight and informed him of the intentions of the flight school employees. (DSUMF ## 10-11.) Malta said he did not want them to proceed with this plan and asked for McKnight's assistance. (*Id*.)

At approximately 4:45, Malta and Deputy McKnight – wearing his flight suit and sidearm – arrived at the airport and proceeded to the ASA maintenance facility at the northern end of the airport. (DSUMF ## 9, 12.) Present at the ASA maintenance facility were several ASA employees, including Plaintiff, Singh, Montoya, Contreras, Canlas, and Robles. (DSUMF # 14.) The group had access to two vehicles, Singh's Hummer and a small pickup truck belonging to ASA employee Nick Robles. (Dec. of G. Gonzalez ¶ 17.) The vehicles were located about fifty feet from the ASA employees.[3] (DSUMF # 51.)

---

[3] Based on the evidence filed by the parties, it appears that the ASA employees, the hangar, and the Hummer were located in the same general direction from where McKnight and Plaintiff argued. It also appears that the Hummer was located approximately fifty feet beyond the ASA employees. See Dep. of G. Gonzalez, Ex. 14; Dep. of N. Robles, Ex. 1; Dep. of M. Canlas, Ex. 1.

**4**

1

2   **C.   Discussions at the ASA Maintenance Field between ASA Employees**

3        **and Airport Manager Malta & the Deputies**.

4        At all relevant times, the parties were huddled in two

5   separate groups, located approximately 10-15 feet apart. (DSUMF #

6   29-32.)   One of the groups was comprised of ASA employees,

7   including Plaintiff and Singh. (*Id.*)   The other group comprised of

8   Deputy McKnight, Malta, and Cope.[4]  (DSUMF # 29-32, 51.)   There was

9   an adversarial posture to the discussions as the ASA employees -

10  led by Plaintiff - were attempting to convince Malta and McKnight

11  to allow them to manually open the landing gear.  (*Id.*)

12       McKnight first spoke with Plaintiff, who repeated the group's

13  plan to manually open the landing gear while driving below the

14  airplane.  Plaintiff then presented the metal tool and stated that

15  Singh was going to drive his Hummer and he was going to manually

16  pull the latch down from the passenger seat.  Plaintiff was told

17  that Malta disapproved of the plan and did not want them to

18  proceed.  McKnight then left to speak with Malta, who was near his

19  vehicle approximately 15 feet from the area where McKnight and

20  Plaintiff had their discussion.  (DSUMF # 18.)

21       Malta was on the phone with the Federal Aviation

22  Administration ("FAA") when McKnight walked over to him. (DSUMF #

23  16.)   Malta handed McKnight the phone and the FAA told McKnight

24  that while they had no enforcement power over the airport, they

25  couldn't support the plan because it was a risky procedure. (DSUMF

26

27       [4] As noted below, Deputy Cope was not present for the
majority of discussions as he did not arrive until approximately

28  5:08 p.m.  (DSUMF # 81.)

**5**

# 16; McKnight Dep. pg. 75.) McKnight then returned the phone to Malta and called dispatch to request another unit. (DSUMF # 17.) McKnight states that he requested an additional unit because Plaintiff appeared agitated during their initial conversation and he expected Plaintiff's agitation to continue. (*Id.*)

Over the next 25 minutes, the two groups remained separate, but had intermittent discussions where Plaintiff tried to convince Malta and McKnight to allow the ASA employees to proceed with their plan. (DSUMF # 29-35.) Malta continually expressed his unwillingness to consent to the plan. (*Id.*)

McKnight suspected that Plaintiff and one or more of his co-workers would attempt the maneuver without obtaining Malta's consent. (DSUMF # 25.) McKnight continually told Plaintiff that Malta did not want them to proceed. (DSUMF ## 10-11,18-28.) Plaintiff did not ignore his instructions and continued in his attempts to convince Malta to allow him on the airfield. (DSUMF ## 20, 39.) Plaintiff's perception was that every time he asked McKnight if he was working on a plan, McKnight told him he would be arrested if he went on the runway. (DSUMF # 28.)

At approximately 5:08, Deputy Cope arrived, in uniform and a marked squad car. (DSUMF # 81.) He then joined a conversation between McKnight and Plaintiff. (DSUMF # 24.)


D.  Use of Force and Arrest

1.  Disputed Facts

a.  Defendants' Account of Use of Force and Arrest

According to Defendants, when told he was not going to be allowed to perform the procedure, Plaintiff stated that he was

**6**

"going out there and it didn't matter what [Deputy McKnight] had to say about it." (DSUMF # 19.) Plaintiff then told the deputies that they would have to arrest him or shoot him to stop him and that time was running out. (DSUMF # 21.)

According to Defendants, Plaintiff then turned and began to walk towards the general direction of the hanger and Hummer. (DSUMF # 41.) McKnight then followed Plaintiff and announced more than once that he should "stop." (DSUMF # 54). McKnight then yelled to Cope to arrest Plaintiff. (DSUMF # 55). Cope then proceeded in Plaintiff's direction. (DSUMF # 53). It took Cope three to five seconds to catch up to Plaintiff, at which point he attempted to grab his left arm from behind, but Plaintiff pulled it back and told the Deputy not to touch him. (DSUMF ## 57, 58.)

Cope then attempted to restrain Plaintiff by placing his arm behind his back. (DSUMF # 59.) Plaintiff then tensed up and brought his wrist up to the general area of his chest. (DSUMF # 60.) Cope continued his attempts to get Plaintiff's hand behind his back as McKnight assisted and attempted to get Plaintiff's other hand behind his back. (DSUMF # 64.) During this time, McKnight could hear yelling from Plaintiff's co-workers telling him to leave Plaintiff alone, but did not hear Plaintiff mention anything about his back. (DSUMF ## 62, 66.)

After struggling to gain control over Plaintiff, McKnight told Cope to tase Plaintiff. (DSUMF # 64.) Cope then tasered Plaintiff. (DSUMF # 64.) The tasing lasted five seconds. ((DSUMF # 70.) McKnight was holding onto Plaintiff during the tasing and lowered him to the ground. (DSUMF # 69.) Once on the ground, Plaintiff had his arms under him and was told to put his arms

**7**

behind his back. (DSUMF # 71.) When Plaintiff did not put his arms behind his back as instructed, Cope tased him a second time. (DSUMF # 71.) The second tasing lasted two seconds. (DSUMF # 71.) Plaintiff then put his arms behind his back and was handcuffed. (DSUMF # 72.) After Plaintiff was handcuffed, he was taken from the area, cited, and released. (DSUMF # 76.)

Deputy McKnight claims he used the taser because Plaintiff was not complying with his orders and for deputy safety as he was concerned Plaintiff would disobey orders and attempt the maneuver with his co-workers. (DSUMF # 25.) Deputy McKnight claims that the use of the taser was "the most reasonable" and "quickest" means to take Plaintiff into custody. (DSUMF # 43.) Deputies McKnight and Cope received training in how to properly use a taser. (DSUMF ## 103, 110.) The Merced County Sheriff's Department had written policies regarding the use of force and the use of a taser at the time of this incident. (DSUMF ## 112, 114.)

### b. Plaintiff's Account of Use of Force and Arrest

According to Plaintiff, Plaintiff told McKnight that they had only one hour left of sunlight and they had better do something or let the ASA employees conduct their plan. (Dec. of G. Gonzalez ¶ 14). Plaintiff then turned around and walked towards his co-workers to await further instruction. (*Id.*) While walking to his co-workers, someone grabbed Plaintiff's arm from behind and spun him around. (*Id.*) This occurred within a few seconds of his comments to McKnight. (*Id.*) Plaintiff did not hear anyone, specifically McKnight or Cope, say that he was under arrest or that he should stop. (*Id.* at ¶ 15.)

Upon being grabbed from behind, Plaintiff says he instinctively raised his arms with his hands open. (Id. at ¶ 17) Plaintiff told the person who grabbed him that he had a back injury. (*Id.*) At that point Plaintiff heard McKnight order Cope to arrest him. (*Id.*) Plaintiff inquired as to the basis for his arrest, at which point Cope grabbed his left arm and McKnight grabbed his right arm. (*Id.*) Plaintiff maintains that he did not move or do anything at this time. (*Id.*) McKnight then ordered Cope to taser him. Cope released Plaintiff's arm, stepped back, and shot him with the taser. (*Id.*)

As a result of the taser, Plaintiff's whole body froze and he fell to the ground, with his right arm underneath his body and his left arm to his side. (*Id.*) At that point, someone grabbed Plaintiff's left arm and pulled it back to arrest him. (*Id.*) The same person ordered Plaintiff to release his right arm. (*Id.*) Plaintiff was unable to do so as he fell on his right arm and a deputy had his knee in Plaintiff's back, thus pinning his right arm beneath his body. (*Id.*) McKnight then ordered Cope to tase Plaintiff a second time, again claiming that he was resisting. (*Id.*) Cope then tasered Plaintiff for a second time. (*Id.*) Plaintiff's right arm released and McKnight pulled it behind his back and handcuffed Plaintiff. (*Id.*)

Plaintiff maintains that the deputies did not have probable cause to arrest him as he had every intention of following McKnight's and Malta's order regarding the handling of the airplane's malfunctioning landing gear. (*Id.* ¶¶ 14, 16.) Plaintiff further argues that he did not make any struggle, move, or resist arrest in any manner. (*Id.* ¶ 17.) Singh's testimony

9

supports Plaintiff's latter claim.  (See Dep. Singh. Pg. 127-128.)

**E.    Procedural History**

On August 7, 2007, Plaintiff filed a complaint against the County of Merced, Merced County Sheriff's Department, and deputies John McKnight and Jason Cope under 42 U.S.C. 1983 for excessive force (Count I); under the California Constitution for unlawful search and seizure (Count II); and state law claims for assault and battery, false arrest and imprisonment, and negligence (Counts III-V).   The deputies are sued in their individual capacities and the County of Merced is sued as a municipal entity that acts by and through its individual deputies.  (Doc. 1.)

Defendants County of Merced, Merced County Sheriff's Department, and Deputies John McKnight and Jason Cope filed their answer on August 29, 2007.  (Doc. 15.)  Defendants filed this motion for summary judgment, or in the alternative, summary adjudication on April 2, 2009.   (Doc. 52.)   Defendants seek judgment on the grounds that Plaintiff cannot 1) establish his federal constitutional claims, 2) overcome the qualified immunity of the individual defendants, or 3) establish Monell liability of the County of Merced.  Defendant also argues the state law claims should be dismissed because the deputies 4) acted lawfully, 5) are entitled to immunity under California Government Code §§ 820.2, 820.4,and 835(a), and 6) Plaintiff lacks evidence to support some of his claims.

Plaintiff filed his opposition to summary judgment or, in the alternative, summary adjudication on April 20, 2009. (Doc.  60.) Plaintiff opposes summary judgment on grounds that triable issues

10

of material fact exist as to his constitutional claims and various state law theories. Plaintiff argues Defendant's deputies unlawfully arrested him and used excessive force. Plaintiff further contends that neither the County of Merced nor the individual defendant deputies are entitled to qualified immunity or any protections under the California Government Code.

On April 20, 2009, Plaintiff filed a declaration in support of his opposition. While the declaration was timely, it did not include penalty of perjury language as required by Rule 56(e). On April 27, 2009, Defendants filed an objection to Plaintiff's declaration. (Doc. 67.) On April 28, 2009, Plaintiff filed an application for leave to file a corrected declaration. (Doc. 68.) Plaintiff stated that the "penalty of perjury" sentence was inadvertently omitted by counsel. Plaintiff's corrected declaration was attached thereto.

Good cause exists to grant leave. No prejudice resulted between April 27th and April 28th. Further, the substance of the declaration was known to Defendants. Plaintiff's application for leave to file a corrected declaration is GRANTED.

### III. LEGAL BACKGROUND.

A. Standard of Review.

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis

for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Where the movant will have the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *see also S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (noting that a party moving for summary judgment on claim as to which it will have the burden at trial "must establish beyond controversy every essential element" of the claim) (internal quotation marks omitted). With respect to an issue as to which the non-moving party will have the burden of proof, the movant "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Soremekun*, 509 F.3d at 984.

When a motion for summary judgment is properly made and supported, the non-movant cannot defeat the motion by resting upon the allegations or denials of its own pleading, rather the "non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Id.* (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Id.*

To defeat a motion for summary judgment, the non-moving party

must show there exists a *genuine* dispute (or issue) of *material* fact. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "[S]ummary judgment will not lie if [a] dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In ruling on a motion for summary judgment, the district court does not make credibility determinations; rather, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

   B.   <u>Section 1983</u>.

   Plaintiff brings this lawsuit under 42 U.S.C. § 1983, which provides a cause of action "against any person acting under color of law who deprives another 'of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003)(quoting 42 U.S.C. § 1983). "The rights guaranteed by section 1983 are 'liberally and beneficently construed.'" *Id*. (quoting *Dennis v. Higgins*, 498 U.S. 439, 443 (1991).

   To establish liability under 1983, a plaintiff must show 1) that he has been deprived of a right secured by the United States Constitution or a federal law, and 2) that the deprivation was effected "under color of state law." *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003).

### C. **Monell Liability**.

Local governments[5] are "persons" subject to suit for "constitutional tort[s]" under 42 U.S.C. § 1983. *Haugen v. Brosseau*, 339 F.3d 857, 874 (9th Cir. 2003) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 n.55 (1978)). "[T]he legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies." *Id*. at 690. These bodies "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's deputies...[or for] deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." *Id*. at 690-91. Although a local government can be held liable for its official policies or customs, it will not be held liable for an employee's actions outside of the scope of these policies or customs.

To establish municipal liability, a plaintiff must prove the existence of an unconstitutional municipal policy. *Haugen*, 351 F.3d at 393.

> [I]t is when execution of a government's policy or custom, whether made by its law-makers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an

---

[5] Although *Monell* dealt with a municipal government's liability under § 1983, the standard there announced was more broadly framed in terms of "a local government." *Brass v. County of L.A.*, 328 F.3d 1192, 1198 (9th Cir. 2003).

entity is responsible under § 1983.

*Monell,* 436 U.S. at 694. There are various ways a plaintiff may prove the existence of an unconstitutional municipal policy under the *Monell* doctrine. These are discussed in context below.

### D.   Suits Against Government Officials: Official Capacity and Individual Capacity Suits.

Suits against an official in her or his official capacity are treated as suits against the entity on whose behalf that official acts. In such suits, the real party in interest becomes the entity for which the official works. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). A federal action for monetary damages against an individual State official acting in his official capacity is barred by the Eleventh Amendment in the same way that an action against the State is barred. *Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 839 (9th Cir. 1997).

In contrast, "[p]ersonal-capacity suits seek to impose personal liability upon a government official for actions [taken] under color of state law." *Dittman v. California*, 191 F.3d 1020, 1027 (9th Cir. 1999)(citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985))(internal quotations omitted). To establish personal liability in a § 1983 action, it is enough to show that the official, "acting under color of state law, caused the deprivation of a federal right." *Hafer*, 502 U.S. at 25 (internal quotations omitted). Public officials sued in their personal capacity may assert personal liability defenses, such as qualified immunity. *Dittman,* 191 F.3d at 1027. Here Plaintiff sues Deputies McKnight and Cope in their individual and official capacities.

1        **E.   Summary Judgment in the Qualified Immunity Context**.

2             In this case, Defendant County of Merced asserts the

3    defense of qualified immunity on behalf of all the individual

4    defendants.  Qualified immunity is based on the policy concern that

5    few individuals would enter public service if they risked personal

6    liability for their official decisions.  *Harlow v. Fitzgerald*, 457

7    U.S. 800, 814 (1982).  The immunity protects "all but the plainly

8    incompetent or those who knowingly violate the law," *Hunter v.*

9    *Bryant*, 502 U.S. 224, 228 (1991), and "spare[s] a defendant not

10   only unwarranted liability, but unwarranted demands customarily

11   imposed upon those defending a long drawn out lawsuit." *Siegert v.*

12   *Gilley*, 500 U.S. 226, 232 (1991).  Qualified immunity is not a

13   defense on the merits; it is an "entitlement not to stand trial or

14   face the burdens of litigation" that may be overcome only by a

15   showing that (1) a constitutional right was in fact violated and

16   (2) no reasonable deputy could believe defendant's actions were

17   lawful in the context of fact-specific, analogous precedents.

18   *Saucier v. Katz*, 533 U.S. 194, 200-202 (2001).   Thus deciding

19   qualified immunity entails a two-step analysis.

20

21                          **IV. DISCUSSION**.

22   **A.   Plaintiff's First Cause of Action**

23        Plaintiff's first cause of action alleges that Deputy

24   McKnight, Deputy Cope, and the County of Merced violated several

25   rights guaranteed him by the Fourth and Fourteenth Amendments,

26   including: a) his right to be free from unlawful arrest; and b) his

27   right to be free from the use of excessive force.

28

                                  16

**1.** **Defendants McKnight and Cope**

    **a.** **Unlawful Arrest.**

Plaintiff alleges McKnight and Cope violated his Fourth Amendment right to be free from unreasonable seizures by unlawfully arresting him. An arrest without probable cause is an actionable unlawful arrest. *Patzig v. O'Neil*, 577 F.2d 841, 848 (3d Cir. 1978). Probable cause exists when the facts are such that a reasonably prudent person would believe that a crime had been committed. *Gerstein v. Pugh*, 420 U.S. 103, 111, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975).

Here, Plaintiff was arrested and cited for obstructing a peace officer under Cal. Penal Code § 148.[6] Penal Code § 148(a) makes it a misdemeanor to "willfully resist[], delay[], or obstruct[] any public officer, peace officer, or an emergency medical technician [...] in the discharge or attempt to discharge any duty of his or her office or employment [....]"

Defendants contend that Plaintiff was arrested and cited for obstruction because Plaintiff attempted to engage in a risky maneuver that put airplane employees, and many citizens of Atwater, in danger. As explained above, Plaintiff wanted to ride as a passenger in Singh's Hummer and manually release the landing gear with a metal hook. Plaintiff had not previously performed this procedure. When the airport manager heard the plan, he told Plaintiff that he and his co-workers were not to perform this

---

    [6] A deputy sheriff is a peace officer. Cal. Penal Code § 830.1(a).

maneuver.[7]  The manager then called Deputy McKnight, who confronted ASA employees, including Plaintiff.

McKnight approached Plaintiff at the airport and told him that he was not allowed to perform the maneuver.  A standoff then emerged between the deputy and ASA employees, who tried to convince Malta to allow them to manually open the plane's landing gear. McKnight claims that Plaintiff then became verbally abrasive and stated things like "they were going to have to shoot him or arrest him to stop him."

Defendants contend that the Plaintiff's uneasiness and the escalating standoff led to an untenable situation.  After several rounds of somewhat heated discussions, Plaintiff was again told that he would not be allowed to perform the maneuver and that he would be arrested if he stepped foot on the runway.  Plaintiff then stated "if you guys don't do something, well, I guess we're going to have to go out and do it."  Plaintiff then turned around and walked in the general direction of the hanger and the Hummer. Plaintiff was then arrested.

Plaintiff argues that there was no probable cause to arrest him because "nothing was actually going to happen" as "there was no possibility that all three of the necessary actors were going to act in defiance of the airport manager's directive."  He further maintains that it was not "their duty [the deputies] to do anything unless and until a vehicle with Plaintiff and the apparatus started driving on the runway."

---

[7] It is undisputed that Plaintiff considered Malta, as airport manager, in charge of the airport.  (DSUMF # 124.)

1   Plaintiff's arguments miss the mark.  Plaintiff focuses on
2   whether he had the tools and personnel available to physically
3   perform the maneuver following his admonishment of McKnight.  That
4   is not the seminal inquiry; rather, the inquiry is whether the facts
5   are such that a reasonably prudent peace officer would believe that
6   Plaintiff violated Cal. Penal Code 148 – i.e., whether Plaintiff
7   willfully resisted, delayed, or obstructed the deputies in the
8   discharge of their duties.

9       Whether or not Plaintiff could actually conduct the maneuver
10  is not the test.  Rather, what Plaintiff's conduct communicated
11  about his intent to violate the deputies' lawful command under the
12  totality of the circumstances is the relevant inquiry.  McKnight and
13  Cope nonetheless had probable cause to arrest Plaintiff if they
14  reasonably believed Plaintiff was resisting, obstructing or
15  interfering with peace officers in the performance of their duties.
16  Taking the facts in the light most favorable to Plaintiff  - i.e.,
17  that McKnight and Cope were mistaken in both thinking Plaintiff had
18  the ability and intent to perform the maneuver and that he was
19  walking in the general direction of the Hummer - do those mistakes
20  negate the existence of probable cause?  The Supreme Court has
21  explained:

22          [b]ecause many situations which confront officers in the
23          course of executing their duties are more or less
            ambiguous, room must be allowed for some mistakes on
24          their part.  But the mistakes must be those of reasonable
            men, acting on facts leading sensibly to their
25          conclusions of probability.

26  *Illinois v. Rodriguez*, 497 U.S. 177, 186,(1990) (*quoting Brinegar
27  v. United States*, 338 U.S. 160, 176 (1949)).  Thus, as long as the
28  deputies' mistaken belief was reasonable in light of the

                                    **19**

circumstances, such mistake will not change the probable cause determination. *Cf. Maryland v. Garrison*, 480 U.S. 79, 85,(1987) (holding that court "must judge the constitutionality of [officers'] conduct in light of the information available at the time they acted.")

Plaintiff does not dispute that he wanted to perform the maneuver with his ASA co-workers or that he repeatedly tried to persuade Malta and the deputies to allow him to do so. Plaintiff admits that he stated "what are they going to do, shoot me?" and then turned his back on the deputies and walked in the general direction of the Hummer. Malta had determined the disengagement attempt should not be performed due to its potential dangerousness and conveyed this to Deputy McKnight. Deputy McKnight issued a lawful order to the plaintiff not to engage in the maneuver. Plaintiff refused to comply with the deputy's command and instead stated his intention to disobey the order and took steps that made it appear he was doing so. The deputies, based on the circumstances that existed, could reasonably, even if mistakenly believe, that Plaintiff was resisting and lawfully interfering with that lawful order, which gave rise to a reasonably belief that probable cause existed to arrest Plaintiff for obstruction.

Under the totality of the circumstances, Plaintiff has failed to raise a material question of fact as to the deputies' probable cause to arrest, the lawfulness of the arrest, and he had not established the officers acted unlawfully under the Fourth Amendment. Assuming arguendo, that Plaintiff could show that McKnight and/or Cope violated his Fourth Amendment right to be free from unlawful arrest, Plaintiff has failed to establish that

McKnight's decision to arrest was so obviously unlawful that a reasonable deputy would have known he was violating Plaintiff's well-established Fourth Amendment rights. McKnight and Cope are entitled to qualified immunity on Plaintiff's unlawful arrest claim.

Defendants' motion for summary judgment as to the claim for unlawful Fourth Amendment seizure is GRANTED.

### b. Excessive Force.

Plaintiff alleges McKnight and Cope violated his constitutional rights by using excessive force against him on February 17, 2007. An officer is justified in using "reasonable force" in effectuating an arrest to the extent the force employed was objectively reasonable. *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1095 (9th Cir. 2006) (citing *Graham v. Connor*, 490 U.S. 386, 395-397 (1989)).

When analyzing excessive force claims, a court's initial inquiry is "whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* (citing *Graham*, 490 U.S. at 397). A court must "consider the facts underlying an excessive force claim from the perspective of a reasonable officer on the scene, without regard to the arresting officer's subjective motivation for using force." *Id.* (citing *Graham*, 490 U.S. at 396-97). "Whether a particular use of force was 'objectively reasonable' depends on several factors, including the severity of the crime that prompted the use of force, the threat posed by a suspect to the police or to others, and whether the suspect was resisting arrest." *Id.* (citing *Graham,* 490 U.S. at 396).

> The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 396-97.

Applying the second step of the *Saucier* analysis, a court must ask whether it would be clear to a reasonable official that his conduct was unlawful in the situation confronted. Although this inquiry is primarily a legal one, where the reasonableness of the officer's belief that his conduct was lawful "depends on the resolution of disputed issues of fact ... summary judgment is not appropriate." *Wilkins*, 350 F.3d at 956.

### 1. Constitutional Violation

Defendants rely on *McMillian v. Gem County, Idaho*, 2008 U.S. Dist. LEXIS 96385 (2008), to assert that their conduct was objectively reasonable. In *McMillian*, a sheriff's deputy was dispatched to a hit-and-run accident on a rural road in Gem County. *Id*. at *2. The deputy gathered the evidence and proceeded to a nearby body shop to see if the owner recognized the vehicle parts. *Id*. The owner of the shop said the parts came from a vehicle owned by Plaintiff. *Id*. The deputy then proceeded to Plaintiff's residence and discovered the damaged car parked in Plaintiff's driveway. *Id*. The deputy asked Plaintiff why he had not reported the accident. *Id*. at *3. Plaintiff gave no reason and went into his house to retrieve his drivers' license and registration.[8] *Id*.

---

[8] A videocamera recorded the entire interaction between the deputy and Plaintiff.

22

After a short discussion, the deputy indicated to Plaintiff that he was going to be placed under arrest for leaving the scene of an accident. *Id.* at *4. Plaintiff became defiant and said he would not go to jail. The Deputy again informed Plaintiff that he was under arrest and Plaintiff said he would not go and began walking back toward his house. *Id.* The deputy asked Plaintiff to stop resisting and pushed him against the truck. *Id.* Plaintiff continued to resist. *Id.* The deputy requested backup and then grabbed his taser from his vehicle. *Id.* at *5. He warned Plaintiff that he was going to taser him if Plaintiff did not get on the ground. *Id.* at *5. The deputy fired the taser after Plaintiff did not get on the ground. *Id.* at *5.

Plaintiff then filed a complaint alleging excessive force in violation of his Fourth and Fourteenth Amendment Rights. *Id.* at *7. The court found that the deputy's conduct did not violate Plaintiff's constitutional rights, the court stated:

> the suspect did pose a potential immediate threat to the safety of the officer or others. [Plaintiff] was adamant he was not going to be arrested or go to jail. While his earlier conversations with the deputy had been cooperative, the attitude and behavior of [Plaintiff] changed after he was told he was under arrest and the deputy was correct in wanting to prevent the Plaintiff from returning to his house. This incident occurred in a rural environment and the law enforcement officer [...] did not know whether Plaintiff had a firearm or other possible weapons in his residence that might place the deputy's safety in danger.

*Id.* at *16.

 *McMillian* does not support Defendants' arguments. First, the deputies arrested Plaintiff for obstructing justice, which is neither a violent crime nor a very serious one. Second, whether or not the deputies had probable cause to arrest Plaintiff, Plaintiff

23

had been discussing the plane's landing gear malfunction, on-and-off with McKnight for approximately twenty-five minutes.  Such interaction between individuals and peace officers is distinguishable from situations where the "deputy did not know whether Plaintiff had a firearm or other possible weapons [...] that might place the deputy's safety in danger."  *Id.* at *16. Here neither officer initially perceived Plaintiff as a threat to their physical safety.

According to Plaintiff, he did not resist arrest.  Plaintiff claims that Deputies Cope and McKnight grabbed him from behind and he did not move or do anything to resist arrest.  He then claims Cope fired the taser at him.  Plaintiff fell to the ground, but his right arm was pinned underneath his body.  One of the deputies grabbed Plaintiff's left arm and pulled it back to arrest him.  The same person ordered Plaintiff to release his right arm.  Plaintiff was unable to do so as his right arm was pinned beneath his body. Plaintiff was then tasered a second time.  He could not physically comply with the order to put his hand behind his back.

Whether the reasonableness of the deputies' belief that their conduct was lawful "depends on the resolution of disputed issues of fact."  *Wilkins*, 364 F.3d at 1110-11.  If so, summary judgment is not appropriate.  *Id.*  Although the Supreme Court warned in *Saucier* that "to deny summary judgment any time a material issue of fact remains on the excessive force claim ... could undermine the goal of qualified immunity to avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment,"  533 U.S. at 202 (internal citations and quotations omitted)*,* Justice Ginsburg clarified in her concurring opinion that

"[o]f course, if an excessive force claim turns on which of two conflicting stories best captures what happened on the street, *Graham* will not permit summary judgment in favor of the defendant official," *Id*. at 216.

Here, we have "two conflicting stories" regarding "what happened on the street." Although the deputies thought he was walking toward the Hummer to attempt the maneuver, Plaintiff denies this. According to Plaintiff's version of the events, he was walking towards his co-workers when he was grabbed from behind and tasered.[9] Once he was tasered the first time, Plaintiff asserts that he did not resist arrest or refuse to put his hands behind his back. The deputies assert that the second tasering was necessary because he would not place his right arm behind his back and was resisting arrest. Plaintiff denies doing so and denies resisting arrest.

The court's initial inquiry is "whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* (citing *Graham*, 490 U.S. at 397). A court must "consider the facts underlying an excessive force claim from the perspective of a reasonable officer on the scene, without regard to the arresting officer's subjective motivation for using force." *Id.* (citing *Graham*, 490 U.S. at 396-97). "Whether a particular use of force was 'objectively reasonable' depends on several factors, including the severity of

_____

[9] Based on the evidence filed by the parties, it appears that the ASA employees, the hangar, and the Hummer were located in the same general direction from where McKnight and Plaintiff argued. It also appears that the Hummer was located approximately fifty feet beyond the ASA employees.

the crime that prompted the use of force, the threat posed by a suspect to the police or to others, and whether the suspect was resisting arrest." *Id.* (citing *Graham,* 490 U.S. at 396).

Here, the immediacy of plane's malfunction and the adversarial posture of the two groups presented a tense atmosphere. However, there are considerable factual disputes about the nature of Plaintiff's actions prompting the use of force and whether he resisted arrest. The reasonableness of the deputies' belief that their conduct was lawful cannot be determined on summary judgment. Viewing the facts in a light most favorable to Plaintiff, if Deputy McKnight did not call for him to "stop" and Plaintiff did not resist arrest, a reasonable finder of fact could conclude that the force applied in this case was objectively unreasonable under the circumstances because it was unnecessary or beyond the level required to apprehend Plaintiff. The disputed accounts put in issue whether less extreme or no force could have been used to take Plaintiff into custody. While officers are not required to use the least intrusive level of force necessary to accomplish lawful goals, *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994), both the court and the jury must consider the alternatives available to the deputies. This is exactly the type of factual dispute that is not amenable to summary adjudication.

### 2. Was the Law Clearly Established?

Here the facts are in dispute as to whether the deputies acted reasonably in using a taser gun to arrest Plaintiff, based on the dispute in facts regarding Plaintiff's conduct while being arrested. The reasonableness of the deputies' beliefs that their

actions were lawful in this situation depends on how the facts are ultimately determined by a trier of fact. They cannot be decided as a matter of law.

The motion as to the Fourth Amendment excessive force claim is DENIED.

## 2. Plaintiff's Monell Claim against the County

A municipality violates § 1983 only when it adopts a policy, or longstanding custom equivalent to a policy, that results in a constitutional injury. *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008); *see also Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1978).

A plaintiff can establish municipal liability in one of three ways: (1) by pointing to a longstanding policy or custom that injured him; (2) by pointing to an injury caused by an action taken in the official capacity of a policymaker; or (3) by showing that a policymaker ratified a subordinate's unconstitutional act. Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) (citing Gillette v. Delmore, 979 F.2d 1342, 1346-47 (9th Cir. 1992)). Whichever option she takes, a plaintiff must show that "there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989); see also Trevino, 99 F.3d at 918 (requiring plaintiff to show that policy was the cause in fact and the proximate cause of the constitutional violation).

There are a number of ways to prove a policy or custom of a municipality. A plaintiff may show (1) "a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity;" (2) "the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision;" or (3) "the official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate." *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005). The Ninth Circuit has held that a municipal policy "may be inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded." Id.

In his opposition, Plaintiff states that "[b]efore receiving defendants' moving papers, plaintiff might have had no choice but to surrender on this issue." (Opp., Pg. 17, ln. 20). Plaintiff then supports his *Monell* claim with an excerpt from Defendants' summary judgment motion stating "the deputies followed the County's policies" while conducting themselves on November 17, 2007. (Id.) Plaintiff further argues that Defendants' expert declarations support his theory that the deputies were "taser happy." (Id. at page 18) Plaintiff argues that these two items present triable issues of fact. (Id.)

In this case, there is no evidence of a longstanding custom that caused Plaintiff's constitutional harm. Plaintiff offers no direct evidence of the existence of any unconstitutional policy, nor any evidence of a pattern of activity on the part of Merced County. No other incidents are described. Plaintiff conclusorily

alleges deputy misconduct in his complaint but never provides any facts - in his opposition or otherwise - to show his alleged constitutional violation was part of a policy or custom of Merced County. Plaintiff has provided no evidence from which any jury could find any relevant custom.

Nevertheless, a municipality may be liable under *Monell* for a single incident where: (1) the person causing the violation has "final policymaking authority;" (2) the "final policymaker" "ratified" a subordinate's actions; or (3) the "final policymaker" acted with deliberate indifference to a subordinate's constitutional violations. *Christie v. Iopa*, 176 F.3d 1231 (9th Cir. 1999).

The first Christie exception - where the person causing the violation has "final policy making authority" - appears not to be applicable here. To prove "ratification" plaintiff must show by admissible evidence that an "authorized policymaker [has] approve[d] a subordinate's decision and the basis for it" and that the policymaker has knowledge of the alleged constitutional violation. *Id*. at 1239. Plaintiff alleges that deputies McKnight and Cope committed constitutional violations on February 17, 2007, not anyone with policy making authority. As such, the second Christie exception is inapplicable.

The third exception -- the final policymaker acted with "deliberate indifference" to a subordinate's constitutional violations -- is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of County Com'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 410 (1997). A municipality's failure to

train, supervise, or discipline an employee can be the basis for § 1983 liability if there is proof of deliberate indifference.

Here Plaintiff provides no evidence regarding deputy training or its adequacy. Plaintiff does not assert how the County of Merced was deliberately indifferent to his constitutional rights. Nor does Plaintiff provide evidence that any deliberate indifference on the County's part or alleged failure to train any deputy "was the moving force" behind the violation of his constitutional rights.[10] There is no training evidence.

The evidence of only one example, this case, and an isolated reference to policy, does not show that the County of Merced either operates under a policy or custom that allows deputies to make unlawful seizures and excessive force, or to act with deliberate indifference toward the rights of persons to be free from such conduct. There are no material issues of fact concerning the County's *Monell* liability.

Summary judgment is GRANTED in favor of the County of Merced as to Plaintiff's *Monell* claim.


B.    <u>Plaintiff's Second Cause of Action</u>.

Plaintiff's Second Cause of Action alleges that Defendants violated Article I, § 13 of the California Constitution when they unlawfully arrested him and used excessive force. Article I, § 13 of the California Constitution provides:

---

[10]    Indeed, the opposite is true; it is undisputed that McKnight and Cope both received extensive training on proper law enforcement techniques. (DSUMF ## 103, 104, and 110.)

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches may not be violated; and a warrant may not issue except on probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons and things to be seized.

(Cal. Const., Art. I, § 13.)

California Civ. Code § 52 sets forth a damages remedy for civil rights violations under California Law. *Koebke v. Bernardo Heights Country Club*, 36 Cal. 4th 824, 836 (2004). Cal. Civ. Code § 52.1(a) provides that if a person interferes, or attempts to interfere, by threats, intimidation, or coercion, with the exercise or enjoyment of the constitutional or statutory rights of an individual or individuals, a civil action may be brought for equitable or injunctive relief. *Venegas v. County of Los Angeles*, 32 Cal. 4th 820, 841 (2004). Cal. Civ. Code § 52.1(b) allows any individual so interfered with to sue for damages. Id. Cal. Civ. Code § 52.1(g) states that an action brought under § 52.1 is independent of any other action, remedy or procedure and may be available to an aggrieved individual under any other provision of law. Id.

Deputies McKnight and Cope argue that Plaintiff's second cause of action is barred by the immunities contained in California Government Code §§ 820.2, 820.4, and 835(a). However, a genuine issue of material fact exists regarding Defendants' use of excessive force in violation of Plaintiff's constitutional rights. Given the factual dispute over the circumstances of Plaintiff's claimed resistance and the deputies' resulting use of force – which provides the underlying basis for the immunities – summary judgment is not appropriate.

31

As to the county, California holds counties liable for acts of their employees under the doctrine of respondeat superior, and grants immunity to counties only where the public employee would also be immune from liability. See Cal. Gov't Code § 815.2; *see also Scott v. County of Los Angeles*, 27 Cal. App. 4th 125, 32 Cal. Rptr. 2d 643, 650 (1994) (Government Code section 815.2, subdivision (a), the County is liable for acts and omissions of its employees under the doctrine of respondeat superior to the same extent as a private employer. Under subdivision (b), the County is immune from liability if, and only if, [the employee] is immune."). Given the factual dispute described above and the derivative nature of the County's liability, Plaintiff's second cause of action against the County survives summary judgment.

Summary judgment is DENIED as to Plaintiff's second cause of action on the excessive force claim.

C. <u>Remaining State Law Claims: Assault and Battery, False Imprisonment/Arrest, and Negligence</u>.

1. <u>Assault and Battery and Negligence</u>.

Because Plaintiff's Fourth Amendment claims of excessive force survive due to the existence of disputed issues of material fact, his state claims for assault and battery and negligence also survive as they flow from the same constitutional violation. Summary judgment is DENIED as to Plaintiff's state law claims for assault and battery and negligence.

2. <u>False Imprisonment/Arrest</u>.

Plaintiff's cause of action for false imprisonment/arrest is

subject to summary judgment as the existence of probable cause is a complete defense to such claims.[11] *See White v. Martin*, 215 Cal. App. 2d 641, 643 (1963); *Blankenhorn v. City of Orange*, 485 F.3d 463, 486-487 (9th Cir. 2007); Cal. Penal Code § 847(b) (an officer cannot be held civilly liable for false arrest or false imprisonment where the officer, "acting within the scope of his or her authority," made a "lawful" arrest or "had reasonable cause to believe the arrest was lawful.") We have concluded that probable cause existed for Deputy McKnight's and Deputy Cope's arrest of Plaintiff. Therefore, the false imprisonment/arrest claims against Defendants cannot stand.

Summary judgment is GRANTED as to Plaintiff's state law claims for false imprisonment/arrest.

D.   Punitive Damages

Punitive damages are authorized in a 42 U.S.C. §1983 claim if a defendant's conduct was malicious, oppressive, or in reckless disregard for a plaintiff's rights. *See Dang v. Cross*, 422 F.3d 800, 806-09 (9th Cir. 2005); Ninth Circuit Model Instr. No. 5.5. Under California state law, punitive damages are authorized if a plaintiff can show by clear and convincing evidence that a defendant acted with malice, oppression, or fraud. See Cal. Civ. Code § 3294(a). Under California law, "malice" means inter alia

---

[11] In California, false arrest is a species of the tort of false imprisonment. *Collins v. City & County of San Francisco*, 50 Cal. App. 3d 671 (1975) ("False arrest is but one way of committing a false imprisonment."). "False imprisonment is 'the nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short.'" *George v. City of Long Beach*, 973 F.2d 706, 710 (9th Cir. 1992).

"conduct which is intended by the Defendant to cause injury to the plaintiff . . . ." Cal. Civ. Code § 3294(c)(1); *Lackner v. North*, 135 Cal.App.4th 1188, 1210, 1212 (2006). The higher "clear and convincing evidence" standard applies at the summary judgment stage. *Brandon v. Rite Aid Corp.*, 408 F.Supp.2d 964, 981 (2006).

Defendants argue that there is no evidence of malice, fraud, oppression, or a reckless disregard for Plaintiff's rights because the deputies were only reacting to a "resolve a bizarre situation and protect lives." (Pl.'s Motion, pg. 31.) However, as discussed above, there is a dispute whether Plaintiff resisted the deputies' efforts to arrest him. If Plaintiff resisted attempts to take him into custody, then the rationale relied upon by Plaintiff to assert his claims for excessive force vanishes. However, without the resistance, a jury could infer malice or a reckless disregard for Plaintiff's rights. Because there is a genuine dispute whether Plaintiff resisted arrest, the motion for summary judgment on the individual Defendants' requests for punitive damages is DENIED, except as to Merced County, a public entity. *City of Newport v. Facts Concerts, Inc.*, 453 U.S. 247 (1981).


## IV. CONCLUSION.

For the reasons set forth above, Defendants' motion for summary judgment is:

(1) GRANTED as to all claims against Merced County Sheriff's Department.

(2) GRANTED as to Plaintiff's section 1983 claim for unlawful arrest against Deputy McKnight and Deputy Cope.

(3) DENIED as to Plaintiff's section 1983 claim for

excessive use of force against Deputy McKnight and Deputy Cope.

**(4) GRANTED** as to Plaintiff's *Monell* claim against the County of Merced.

**(5) DENIED** as to Plaintiff's claim under Article I, § 13 of the California Constitution.

**(6) DENIED** as to Plaintiff's state law claims for assault and battery and negligence.

**(7) GRANTED** as to Plaintiff's state law claim for false imprisonment/arrest.

**(8) DENIED** as to Plaintiff's claim for punitive damages against the individual officers for excessive force.

Defendants shall submit a form of order consistent with this memorandum decision within five (5) days of electronic service.

IT IS SO ORDERED.

Dated: __May 13, 2009__          _____/s/ Oliver W. Wanger_____
                                 UNITED STATES DISTRICT JUDGE